MARK POE (S.B. #223714)
  mpoe@gawpoe.com
RANDOLPH GAW (S.B. #223718)
  rgaw@gawpoe.com
SAMUEL SONG (S.B. #245007)
  ssong@gawpoe.com
VICTOR MENG (S.B. #254102)
  vmeng@gawpoe.com
GAW | POE LLP
4 Embarcadero, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

Attorneys for Plaintiff U.S. Wholesale
Outlet & Distribution, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| U.S. WHOLESALE OUTLET & DISTRIBUTION, INC.<br><br>                    Plaintiff,<br><br>        v.<br><br>LIVING ESSENTIALS, LLC and INNOVATION VENTURES, LLC<br><br>                    Defendants. | Case No. 2:18-cv-1077<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff U.S. Wholesale Outlet & Distribution, Inc., ("Plaintiff") alleges as follows:

### JURISDICTIONAL STATEMENT

1.      The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because some of Plaintiff's claims arise under federal law.

2.      The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) because all Plaintiff is a citizen of California, all defendants are citizens of Michigan, and the amount in controversy exceeds $75,000.

3.      The Court has supplemental jurisdiction of Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Plaintiff is a citizen of California, with its principal place of business in this district.

## INTRODUCTION

5.      The federal Robinson-Patman Act, 15 U.S.C. § 13 (the "RPA"), makes it illegal for a manufacturer (known in RPA parlance as a "supplier") to charge higher prices to "disfavored" customers, while charging lower prices to "favored" customers, where those two sets of customers are in competition with each other. This illegal conduct is known in antitrust law as "price discrimination."  As the Supreme Court explained in the seminal RPA precedent of *FTC v. Morton Salt Co.*:

> The legislative history of the Robinson-Patman Act makes it abundantly clear that Congress considered it to be an evil that a large buyer could secure a competitive advantage over a small buyer solely because of the large buyer's quantity purchasing ability.   The Robinson-Patman Act was passed to deprive a large buyer of such advantages except to the extent that a lower price could be justified by reason of a seller's diminished costs due to quantity manufacture, delivery or sale, or by reason of the seller's good faith effort to meet a competitor's equally low price.

334 U.S. 37, 43 (1948).

6.      In this case, the Defendants Living Essentials, LLC and Innovation Ventures, LLC (together, "Living Essentials") are the suppliers of the popular energy drink 5-Hour Energy.  For years, Living Essentials has continuously violated the RPA by selling 5-Hour Energy to the giant wholesaler Costco

1   Wholesale Corporation at prices that are far lower than the prices Living Essentials
2   charged to Plaintiff and other private, family owned wholesalers.

3         7.      Plaintiff competes directly with Costco for sales of 5-Hour Energy to
4   convenience stores and other retail outlets, and it has lost hundreds of thousands of
5   dollars in 5-Hour Energy sales over the applicable limitations period as a result of
6   Living Essentials' illegal discrimination.

7         8.      Plaintiff brings this action to recover those damages, and to obtain an
8   injunction prohibiting further price discrimination against it.

9                            **STATUTORY BACKGROUND**

10        9.      The federal Robinson-Patman Act, 15 U.S.C. § 13, was enacted
11  because Congress considered it to be an evil that some buyers of commodities
12  could secure a competitive advantage through receiving special prices, discounts,
13  rebates, allowances or other forms of price discrimination offered by the seller that
14  were not made available to other buyers.

15        10.     In particular, Congress was concerned that large corporations could
16  take advantage of their greater purchasing power to demand specially discounted
17  pricing from suppliers, and leverage that advantage to undercut and drive out of
18  business the local, community-based businesses with whom they compete.  As the
19  last fifty years of American commerce have shown, this concern was well-founded.

20        11.     Accordingly, the Robinson-Patman Act forbids all sellers from
21  discriminating in price among different purchasers of commodities of like grade
22  and quality, where those purchases are subsequently used in commerce.

23        12.     The California state legislature similarly viewed with concern the
24  impact that a large corporation's ability to demand (and a manufacturer's
25  willingness to grant) exclusive, favorable pricing would have on competition
26  between giant purchasers and the local, community-based businesses they compete
27  with.

28

COMPLAINT
CASE NO. 2:18-CV-1077

13.     As a result, the California state legislature passed the Unfair Practices Act, Cal. Bus. & Prof. Code § 17045, which forbids a seller from secretly offering rebates, allowances, commissions or other unearned discounts to some buyers at the exclusion of other buyers.

14.     At the heart of both the Robinson-Patman Act and the Unfair Practices Act is the recognition that small businesses are a critical and necessary component of the American economy.  Their continued existence and vitality provides healthy competition to large chains and benefits all consumers.  As eloquently stated by Representative Wright Patman, the eponymous sponsor of the Act:

> In the field of merchandise distribution a Goliath stands against divided forces, plying a powerful weapon with a skillful hand against the vulnerable weaknesses of his opponents.  The Goliath is the huge chain stores sapping the civic life of local communities with an absentee overlordship, draining off their earnings to his coffers, and reducing their independent business men to employees or to idleness.

*Remarks of Rep. Wright Patman introducing H.R. No. 8442*, 79 Cong. Rec. 9077 (June 11, 1935).  One need look no further than the managerial staff of the "favored customer at issue here"—Costco Wholesale Corporation—to find numerous examples of former "independent business men," who have lost their businesses due to unfair competition, and thereby been reduced to mere employees of this Goliath.

15.     Other supporters explained that among the RPA's express purposes is the protection of small businesses.  That goal was not rooted in charity, however.  It was rooted in what Congress perceived as the importance of small businesses to the fabric of American society:

> [The purpose] is not to protect an individual, it is not to give the little fellow more money, it is not to take something from somebody

else, but it is to build strong again the foundation of our Government
and our civilization.  That is the job presently before us.  You cannot
have it with a few great economic overlords to whom everybody else
owes economic allegiance. . . The American people are not going to
stand for a few lords of industry destroying this country [Applause].

*Remarks of Rep. Sumners, Debate in the House of Representatives on H.R. No.
8442*, 80 Cong. Rec. 8109 (May 27, 1936).  Plaintiff is among those Americans
who will not stand for it, and brings this lawsuit accordingly.

16.     Plaintiff is exactly the type of small, local, community-owned business
that Congress and the California state legislature sought to protect with the
Robinson-Patman Act and the Unfair Trade Practices Act.  It is a small wholesale
food and sundry good distribution company that supplies products to local,
independent businesses such as groceries, convenience stores and gas stations
bypassed by large vendors.  The favored customer, Costco Wholesale Corporation,
competes with Plaintiff for that same segment of business.  In particular, the
division of Costco known as Costco Business Centers specifically targets small
"mom and pop" retail convenience stores as its main customer group—the exact
customers targeted by Plaintiff.

**HARM TO COMPETITION**

17.     The Robinson-Patman Act's purpose of protecting competition by
means of protecting individual competitors makes it unique among the federal
antitrust laws.  Indeed, such harm is sufficiently demonstrated by proof of harm to
the disfavored businesses themselves:

We agree with Judge Mikva and the Third Circuit.  We are persuaded
that the language that the Robinson-Patman Act added to § 2(a) of the
Clayton Act — "to injure, destroy, or prevent competition" — expresses
Congressional intent to protect individual competitors, not just market
competition, from the effects of price discrimination.  As we said in
*Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1446 n. 18 (9th

Cir.1995) (dicta), "[t]he purpose of this passage was to relieve secondary-line plaintiffs — small retailers who are disfavored by discriminating suppliers — from having to prove harm to competition marketwide, allowing them instead to impose liability simply by proving effects to individual competitors." *See also* 3 Earl W. Kintner & Joseph P. Bauer, *Federal Antitrust Law* §§ 19.2, 22.4 (1983) (addition of phrase "to injure, destroy, or prevent competition with any person" was to expand protection of original Clayton Act to individual competitors).

*Chroma Lighting v. GTE Products Corp.*, 111 F.3d 653, 657 (9th Cir. 1997).  The *Chroma Lighting* court summarized:  "We hold that in a secondary-line Robinson-Patman case, the *Morton Salt* inference that competitive injury to individual buyers harms competition generally may not be overcome by proof of no harm to competition." *Id.* at 658.

18.     The precedent notwithstanding, the competitive landscape and individual consumers themselves have *also* been harmed by Living Essentials' illegal price discrimination.  The discriminatorily high prices charged to Plaintiff were necessarily passed on (at least in part) to its retail-store customers.  Those retail-store customers thus necessarily paid more for the same inventory than they would have paid had Living Essentials not discriminated against Plaintiff.  In turn, those retailers necessarily passed along at least part of that increased costs to the individual 5-Hour Energy consumers who patronized those stores.  Had Living Essentials complied with the Robinson-Patman Act and California law, those consumers would have paid similarly low prices for 5-Hour Energy at their local corner store, regardless of whether that store owner sourced its inventory from Plaintiff or from Costco.

19.     Plaintiff is entitled to treble damages, restitution, and injunctive relief for the discrimination levied against them by Living Essentials.

1

## PARTIES

2        20.    Plaintiff U.S. Wholesale Outlet & Distribution, Inc. is a California

3  corporation with its principal place of business in Los Angeles County, California.

4        21.    Defendants Living Essentials, LLC and Innovation Ventures, LLC are

5  Michigan limited-liability companies with their principal place of business in

6  Oakland County, Michigan.  Living Essentials, LLC is the manufacturer and

7  distributor of 5-Hour Energy, and Innovation Ventures, LLC is its corporate parent.

8

## FACTUAL ALLEGATIONS

9

### Plaintiff's Wholesale Business

10        22.    Plaintiff is in the business of purchasing food, beverages and consumer

11  products from various companies and then reselling those products on a wholesale

12  basis to retail outlets or other wholesalers.

13        23.    Plaintiff purchases large volumes of food, beverages, and consumer

14  products that the average consumer would see on the shelves of local convenience

15  stores and markets.  Small, independent wholesalers or retailers in the southern

16  California region shop at its warehouse and purchase goods for resale.  Businesses

17  like Plaintiff is often called a "cash and carry wholesaler" within the industry

18  parlance.

19

### The 5-Hour Energy Product

20        24.    5-Hour Energy is a popular energy drink that has been manufactured

21  and sold by Living Essentials since 2004.  5-Hour Energy is sold as a liquid in 1.93-

22  ounce bottles at more than 100,000 retail locations in the United States.

23        25.    On average, Living Essentials sells more than 9 million bottles of 5-

24  Hour Energy each week.  Total annual retail sales are in excess of one billion

25  dollars.

26        26.    5-Hour Energy comes in two varieties, "regular" and "extra-strength,"

27  and several different flavors.  All bottles of 5-Hour Energy manufactured and sold

28  by Living Essentials are of like grade and quality, as the only material differences

COMPLAINT
CASE NO. 2:18-CV-1077

between them are the type of artificial flavoring used per type of bottle (e.g., "berry flavored, "orange flavored," etc.) and the amount of caffeine in each type of bottle (differentiating extra-strength and regular).

27.    Living Essentials manufactures all bottles of 5-Hour Energy in Wabash, Indiana, and then sells and distributes them around the country, including California.

28.    In selling 5-Hour Energy to all of its customers, including Plaintiff and Costco, the specific *unit* of sale by which Living Essentials sells 5-Hour Energy to both Plaintiff and Costco is the individual bottle.

29.    In selling 5-Hour Energy to California-based wholesalers, Living Essentials uses a broker to whom it has granted the exclusive rights to negotiate sales of 5-Hour Energy on its behalf.

30.    The broker that was granted the exclusive right to negotiate sales of 5-Hour Energy to Plaintiff and other family-owned wholesalers is a California-based company called Paramount Sales Group ("Paramount").

31.    Paramount acts strictly as a broker for such sales.  It does not buy 5-Hour Energy from Defendants and then re-sell it to Plaintiff.  Nor does it ever take possession of the 5-Hour Energy that Plaintiff purchases from Living Essentials, nor does it determine the price that different customers must pay to Living Essentials.  Instead, all sales of 5-Hour Energy brokered by Paramount must be approved by Living Essentials.  Furthermore, all pricing of 5-Hour Energy, including discounts, is set by Living Essentials, and Paramount has no say in the matter.

32.    The invoices that Plaintiff receives for sales of 5-Hour Energy are issued directly by Living Essentials, and payments are made directly to Living Essentials.  Paramount does nothing more than act as the point of contact for commercial purchasers of 5-Hour Energy in California.

33.     Living Essentials' sales to Costco are brokered through a similar arrangement with a company called Level One Marketing.

**Living Essentials Has Discriminated Against Plaintiff and in Favor of Costco for Many Years**

34.     Paramount represented to its wholesaler customers that Living Essentials employs flat pricing for 5-Hour Energy, and that they were receiving the best possible price.  Neither Paramount nor any other representative of Living Essentials ever disclosed to Plaintiff (nor to any of Paramount's other customers) that Costco received a more favorable price.  To the contrary, Costco's favored prices were treated by Living Essentials as a closely guarded secret, to the extent that not even Living Essentials executives with responsibility for overseeing 5-Hour Energy sales to wholesalers in California were privy to those prices.

35.     The price discrimination against Plaintiff and in favor of Costco begins with the "list price" it received.  Over the relevant time period, the list price to Plaintiff has been $1.45 and $1.60 per bottle for regular and extra-strength respectively, while the list price to Costco was $.10 lower per bottle, or $1.35/$1.50.

36.     Plaintiff and other California wholesalers like it (whom Living Essentials internally classified as "C-Store Wholesales," i.e., convenience-store wholesalers) could also receive a $.07/bottle "everyday discount."  Thus, the average price paid by Plaintiff was $1.38 per bottle for regular strength and $1.53 per bottle for extra-strength, or 3 cents per bottle higher than the list price to Costco.  From the onset, Costco received a material competitive advantage from having a 2% price difference.

37.     Costco, in addition, received a great variety of discounts, rebates, and promotional payments, on top of its existing $.10/bottle list price advantage, as confirmed by numerous, internal Living Essentials pricing documents.  Those discounts ranged from a discount for placing orders electronically, to frequent

rebate offers by which Costco would be paid between $3.60-$7.20 for each box of 5-Hour Energy it sold, to a fixed "spoilage allowance" (regardless of any actual spoilage losses), to product-placement payments for prominent display of 5-Hour Energy in Costco stores, to payments given to subsidize Costco's advertising. None of these other discounts, rebates, or promotions were made available to Plaintiff. Indeed, Living Essentials deliberately kept hidden the very existence of these discounts, rebates, and promotions from Plaintiff.

38. An example of one such discount was what Living Essentials called a "business scan promotion." Customers buying 5-Hour Energy from Costco would receive an on-the-spot additional discount from Costco, and Living Essentials would then reimburse Costco for that discount. Plaintiff has never even heard of any business scan discounts from Paramount or Living Essentials, and certainly was never offered any equivalent deals from either of them.

39. Living Essentials kept track of the price discounts it offered to Costco for its own purposes. For example, an internal pricing analysis performed by Living Essentials revealed that Costco paid an average price of $1.12 per bottle for regular strength 5-Hour Energy, compared to the $1.38 per bottle paid by Plaintiff. A Living Essentials executive later bemoaned in an e-mail that "If I was an Independent retailer I would buy my 5 Hour Energy at Costco…. They can get at Costco for .27 cent less per bottle!"

40. As another example, another Living Essentials executive noted to himself in a July 20, 2015 e-mail that Costco was able to buy 5-Hour Energy "at $1.20 per bottle vs. $1.38 a bottle" that Living Essentials charged to cash and carry wholesalers for the regular strength flavors.

41. Yet another example is provided by an April 11, 2016 e-mail sent by one Living Essentials executive to one of the highest-ranking executives in the company. In that communication, Living Essentials noted that Costco was selling 5-Hour Energy to its customers at a price of $1.16 per bottle of regular strength. In

1   other words, Living Essentials' prices to Costco were so low, that Costco was able

2   to sell to its customers at a price that was $.22 per bottle less than the best price

3   offered by Living Essentials to Plaintiff.

4         42.    The convenience-store wholesale industry is one of thin margins,

5   including for products like 5-Hour Energy.  These low margins are the result of the

6   fact that wholesalers' retail-store customers are extremely price sensitive.  In the

7   words of Living Essentials' National Account Manager who oversaw the

8   company's sales to Plaintiff, "for a penny [customers] would go somewhere else

9   and buy it if they get a penny cheaper."

10         43.    Faced with a cost of goods for 5-Hour Energy that was 15-20% higher

11   than that paid by their competitor Costco, as a matter of mathematics Plaintiff has

12   been unable to compete with Costco on price for 5-Hour Energy, and has

13   accordingly lost hundreds of thousands of dollars in sales that it otherwise would

14   have had in the absence of the discrimination.

15         44.    Indeed, Plaintiff has had numerous retail-store customers tell its

16   employees that they were buying 5-Hour Energy from Costco instead of from

17   Plaintiff due to the lower prices charged by Costco.  Plaintiff could not match such

18   prices, as doing so would require Plaintiff to take a loss on selling 5-Hour Energy.

19         45.    Plaintiff has also observed for itself that its sales of 5-Hour Energy

20   have declined over time, and Living Essentials' internal e-mails have noted that

21   Costco has been selling an increasing volume of 5-Hour Energy every year.

22         46.    Plaintiff repeatedly complained to Paramount that Costco somehow

23   managed to sell 5-Hour Energy at prices lower than what Living Essentials charged

24   to Plaintiff.  Paramount always told Plaintiff that Living Essentials was already

25   giving them the lowest possible price on the product.

26   **LIVING ESSENTIALS RECOGNIZED THE DEGREE OF THE PRICE**
     **DISCRIMINATION AND ITS IMPACT ON PLAINTIFF**

27

28

47.     For years, Living Essentials' employees have internally recognized the degree of price discrimination against Plaintiff and other cash and carry wholesalers and in favor of Costco, and have also recognized its detrimental impact on Plaintiff and other cash and carry wholesalers.  Four individuals were central to these discussions.  The first is Kevin Riffle, the President of Paramount, the broker of 5-Hour Energy sales to Plaintiff and the other family-owned wholesalers in California.  Mr. Riffle reported to Clark Eaves, the previously mentioned National Account Manager who supervised Paramount, and was responsible for sales of 5-Hour Energy to wholesalers in California.  Mr. Eaves reported to Vince Sullivan, Living Essentials' Director of Sales, Convenience Stores West.  Mr. Sullivan reported to Steve Ramsey, Living Essentials' Vice President of Sales.  Mr. Ramsey reported to Living Essentials' highest-ranking executive, Rise Meguiar.

48.     In the course of those discussions Clark Eaves complained that "Costco Business Center is the <u>only</u> C-Store wholesaler that receives and promotes deals on open stock 5-Hour Energy," and advised Mr. Ramsey, "the [Costco pricing] drives retailers to the [Costco] business centers where they are able to stock up on each of the flavors at a big saves vs what they pay from a wholesaler."

49.     A year later Mr. Eaves informed Living Essentials' Director of Sales Operations:  "The wholesalers' customers will not buy from them since they can get it cheaper at Costco."  He further explained that the discrimination "really hurts the West," and "in my opinion it doesn't help anyone except Costco."  Mr. Eaves discussed this issue thoroughly with Paramount's President, Kevin Riffle, who observed the obvious (and legally required) solution:  "I think a solution to this would be to mirror the promotion to wholesalers that are in the same market as the Costco Business Centers."

50.     These executives recognized the discrimination and its impact in dozens of other emails, including the following observations:

- <u>Mr. Riffle</u>: "Clark/Vince, this is getting really bad. We cannot sell 5-Hour Energy to our customers with all this deal product out there. This needs to stop, or we need to be able to sell at equal pricing!!!"

- <u>Mr. Sullivan</u>: "This is at least the second heavy deal at Costco Business Centers this year which is having a major negative impact on wholesalers and Distributors out West."

- <u>Mr. Eaves</u>: "Vince, I think this is very obvious as to the cause of the Wholesaler decline… **Costco**."

- <u>Mr. Eaves</u>: "Steve this really hurts our wholesale business when Costco sells 5 Hr below our cost."

- <u>Mr. Eaves</u>: "This [Costco's favoritism] has been going on since I have been with the company."

51.     Living Essentials and Paramount further recognized that Plaintiff competes directly with Costco for sales of 5-Hour Energy to convenience stores.  A major source of competition between Plaintiff and Costco took place with the division of Costco known as Costco Business Centers, of which there are three locations in the Los Angeles Basin (at Commerce, Westminster, and Hawthorne), and one in San Diego.  As Costco's legal representative admitted during a deposition, the Costco Business Centers expressly target small mom-and-pop stores as their customer base, the same customer base that Plaintiff targets.

52.     In a June 2015 email to Mr. Sullivan and Mr. Eaves, Paramount's Director of Sales, Sean Riffle, specifically observed that Plaintiff competes with Costco Business Centers for sales of 5-Hour Energy.  In a summary of Paramount's "California Growth Strategy," Mr. Riffle proposed offering more discounts and promotions to Paramount's wholesalers "to get sales moving in the right direction." He lamented:

"These customers directly compete with Costco Business Centers and have seen sales plummet as Costco runs 5-Hour at $1.31 Reg

Strength and $1.42 on Extra Strength a few times per year.  We are hoping to give these important customers a way to compete with Costco when they are on promotion."

His email then set forth a chart of the wholesalers he had in mind, including "U.S. Wholesale Outlet, Inc." as one of thirteen such businesses that "directly compete" with the Business Centers.  Mr. Riffle's chart predicted that without such intervention, U.S. Wholesale's purchases of 5-Hour Energy would be down over $268,000 in 2015 compared to 2014.  And Mr. Riffle's predictions proved accurate, as U.S. Wholesale's purchases (and resulting sales) of 5-Hour Energy did materially decline from 2015 compared to 2014, just as it had from 2014 compared to 2013.

53.    Exactly as internally observed in the foregoing emails, Plaintiff has lost hundreds of thousands of dollars of sales of 5-Hour Energy over the applicable limitations period, and made lower profits on their existing sales, because many of their existing customers switched to purchasing 5-Hour Energy from Costco.  The logical necessity of that behavior by retail-store buyers of 5-Hour Energy was contemporaneously documented by Living Essentials.  For example, in response to Mr. Eaves' observation that it was "very obvious" that Costco has been "the cause of the Wholesaler decline," Mr. Sullivan responded on May 4, 2016:  "You are absolutely right.  This is a run away train!!!!!!!!!!!!!!!!!!!!!!"

## FIRST CLAIM FOR RELIEF
### (Robinson-Patman Act, 15 U.S.C § 13(a))

54.    Plaintiff hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

55.    Living Essentials engaged in price discrimination against Plaintiff by selling 5-Hour Energy to favored purchasers such as Costco Wholesale Corporation at both list and net prices that are far lower than the list and net prices that Living Essentials charged to Plaintiff.  The various discounts and rebates that were offered

to Costco were not offered nor otherwise available to Plaintiff. Living Essentials further engaged in indirect price discrimination by making monetary promotional payments to Costco in conjunction with Costco's sale of 5-Hour Energy, which promotional payments were never offered to Plaintiff.

56.   Living Essentials' price favoritism to Costco was not justified by any cost savings it realized in conjunction with those sales. To the contrary, Living Essentials' costs in supplying Costco with 5-Hour Energy were equal to or higher than its costs in supplying Plaintiff.

57.   The effect of Living Essentials' acts of price discrimination has been to substantially harm competition between Costco and others of Living Essentials' favored purchasers on the one hand, and Plaintiff and other cash and carry wholesalers on the other.

58.   This price discrimination has in turn caused economic harm to the retail stores who purchased 5-Hour Energy from Plaintiff, because those stores paid (and continue to pay) more for that product than they would if Living Essentials did not discriminate against Plaintiff. Indeed, had Living Essentials' followed Paramount's August 2015 plea to Mr. Eaves and Mr. Sullivan that "we need to be able to sell at equal pricing!!!," or Mr. Eaves' plea to Mr. Sullivan that "[w]e need to be on an equal playing field," those retail stores would have realized cost savings of roughly $.20 per bottle on their purchases from Plaintiff.

59.   In turn, Living Essentials' price discrimination harmed end-consumers in California, who paid (and continue to pay) more for 5-Hour Energy (at least on the purchases they make from non-Costco supplied retail stores) than they would pay if Living Essentials complied with the law.

60.   Plaintiff has been damaged by Living Essentials' discrimination through losing retail-store customers to Costco, by its inability to attract new customers through price-competition with Costco, by making lower profits on its

1  existing sales, and by selling lower volumes of 5-Hour Energy than it would sell in

2  the absence of the discrimination.

3  **SECOND CLAIM FOR RELIEF**
   **(Robinson-Patman Act, 15 U.S.C. § 13(d))**

4

5  61.     Plaintiff hereby re-incorporates and re-alleges all the preceding

   paragraphs as if fully set forth herein.

6

7  62.     Living Essentials provided promotional payments and/or services to

8  Costco Wholesale Corporation that it never offered to Plaintiff, let alone on the

   "proportionally equal terms" required by section 2(d) of the RPA.  Those

9  promotional payments and services were given to Costco in conjunction with, inter

10  alia, favorable product placement on aisle "end caps," product placement near a

11  store's entryway, and payments to subsidize Costco's advertising of 5-Hour

12  Energy.

13

14  63.     Plaintiff has been and continues to be harmed by these discriminatory

   promotional allowances and payments, both insofar as those promotions allowed

15  Costco to attract additional sales, and insofar as those payments amounted to an

16  indirect subsidy of the net price Costco paid for 5-Hour Energy.

17  **THIRD CLAIM FOR RELIEF**
   **(California Unfair Practices Act, Cal. Bus. & Prof. Code § 17045)**

18

19  64.     Plaintiff hereby re-incorporates and re-alleges all the preceding

20  paragraphs as if fully set forth herein.

21  65.     The discounts, rebates, and other promotional allowances offered by

22  Living Essentials to Costco were secret and undisclosed to Plaintiff.  That is, as

23  alleged above, Plaintiff has been continuously told by Living Essentials' broker that

24  5-Hour Energy is sold at a flat price, and that Plaintiff was getting the best possible

25  price.

26  66.     The effect of such price discrimination has been to substantially harm

27  competition among Living Essentials' favored purchasers/wholesalers such as

28

- 16 -

COMPLAINT
CASE NO. 2:18-CV-1077

Costco, and Plaintiff, who directly competes with Costco for sales of 5-Hour Energy to retail stores in California.

67.     This price discrimination has in turn caused economic harm to retail stores in California who purchased 5-Hour Energy from Plaintiff, and thus have paid, and continue to pay, more for 5-Hour Energy than they would pay had Living Essentials complied with the law.  Thereby, consumers purchasing 5-Hour Energy from those stores are similarly paying higher prices than they would pay if Living Essentials had offered the same pricing to Plaintiff.

68.     Plaintiff has been damaged by Living Essentials' actions, by having their customers purchase 5-Hour Energy from Living Essentials' favored purchasers/wholesalers instead, and/or by enjoying lower profits on their existing sales of 5-Hour Energy.

### FOURTH CLAIM FOR RELIEF
**(California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200)**

69.     Plaintiff hereby re-incorporates and re-alleges all the preceding paragraphs as if fully set forth herein.

70.     Living Essentials' actions are in violation of the federal Robinson-Patman Act and the California Unfair Practices Act and therefore constitute unlawful and unfair conduct within the meaning of California's unfair competition law.

71.     Plaintiff are entitled to restitution and injunctive relief under California's unfair competition law.

### PRAYER

**WHEREFORE**, Plaintiff U.S. Wholesale Outlet & Distribution, Inc. and prays for judgment as follows:

1.     For judgment against Defendants Living Essentials, LLC and Innovation Ventures, LLC;

2.     For compensatory and treble damages;

1    3.     For restitution to Plaintiff;

2    4.     For preliminary and permanent injunctive relief;

3    5.     For attorneys' fees;

4    6.     For costs; and

5    7.     For such other and further relief as the Court deems just and proper.

6

7    Dated:  February 8, 2018               GAW | POE LLP

8

9                                           By: _____

10                                          Mark Poe
                                            Attorneys for Plaintiff U.S.
11                                          Wholesale Outlet & Distribution,
                                            Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT
CASE NO. 2:18-CV-1077

1    Plaintiffs U.S. Wholesale Outlet & Distribution, Inc. hereby demands a jury

2   trial for its claims against Defendants Living Essentials, LLC and Innovation

3   Ventures, LLC.

4

5        Dated:  February 8, 2018          GAW | POE LLP

6

7                                    By:   _____

8                                          Mark Poe
                                           Attorneys for Plaintiff U.S.
9                                          Wholesale Outlet & Distribution,
                                           Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT
CASE NO. 2:18-CV-1077