MARK POE (S.B. #223714)
  mpoe@gawpoe.com
RANDOLPH GAW (S.B. #223718)
  rgaw@gawpoe.com
SAMUEL SONG (S.B. #245007)
  ssong@gawpoe.com
VICTOR MENG (S.B. #254102)
  vmeng@gawpoe.com
GAW | POE LLP
4 Embarcadero, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| U.S. WHOLESALE OUTLET & DISTRIBUTION, INC., et al.<br><br>Plaintiffs,<br><br>v.<br><br>LIVING ESSENTIALS, LLC and INNOVATION VENTURES, LLC<br><br>Defendants. | Case No. 2:18-cv-1077-CBM-E<br><br>**[REDACTED VERSION]**<br><br>**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Judge:          Hon. Consuelo Marshall<br>Hearing Date: June 11, 2019<br>Time:           10:00 am<br>Courtroom:    8B, 8th Floor<br><br>Discovery Cutoff:    March 1, 2019<br>Pretrial Conference: Sept. 10, 2019<br>Trial Date:            Oct. 1, 2019 |

1

## <u>NOTICE OF MOTION AND MOTION</u>

2

**TO DEFENDANTS AND THEIR COUNSEL OF RECORD:**

3    PLEASE TAKE NOTICE THAT June 11, 2019, at 10:00 a.m., in the

4   courtroom of the Honorable Consuelo B. Marshall, located at Courtroom 8B of the

5   Central District of California courthouse, 350 W. 1st Street, Los Angeles,

6   California, 90012, Plaintiffs U.S. Wholesale Outlet & Distribution, Inc., Trepco

7   Imports & Distribution, Ltd.; YnY International, Inc.; Eashou, Inc. (d/b/a San

8   Diego Cash & Carry); California Wholesale; Sanoor, Inc. (d/b/a L.A. Top

9   Distributor); and L.A. International Corporation (collectively, "Plaintiffs") will and

10  hereby do move the Court, pursuant to Federal Rule of Civil Procedure 56, for

11  partial summary judgment as to Defendants' Living Essentials, LLC and Innovation

12  Ventures, LLC's (collectively, "Living Essentials") liability under sections 2(a) and

13  2(d) of the Robinson-Patman Act, and under section 17045 of the California Unfair

14  Practices Act.

15      This motion is based upon the following memorandum, the accompanying

16  declarations and exhibits, the papers and pleadings on file with the Court, and such

17  other argument and materials as may be presented before the Court takes this

18  motion under submission.

19      This motion is made following the conference of counsel pursuant to L.R. 7-

20  3, which took place on April 23, 2019.

21

22   Dated: May 7, 2019                    GAW | POE LLP

23

24                                          By:

25                                              Mark Poe
                                                Attorneys for Plaintiffs
26

27

28

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 3

    A.  The Parties ................................................................................................ 3

    B.  Living Essentials Sells 5-hour Energy to Plaintiffs and to Costco. ........... 3

    C.  Living Essentials Engages in Price Discrimination. ................................... 4

    D.  Costco Sells 5-hour Energy to Plaintiffs' Customers. ............................... 6

LEGAL STANDARDS ............................................................................................ 7

ARGUMENT ........................................................................................................... 8

I.    PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF BECAUSE THERE IS NO GENUINE FACTUAL DISPUTE AS TO ANY OF THE FOUR ELEMENTS OF SECTION 2(A) LIABILITY. ................................... 8

    A.  The First Two Elements of Liability are Established By Living Essentials' Admissions. ............................................................................. 9

    B.  There Is No Genuine Dispute as to the Third Element: That Living Essentials Discriminated In Price Against Plaintiffs in Favor of Costco. 10

        1.  The Record Evidence Uniformly Establishes that There was Price Discrimination. ................................................................................ 10

        2.  The Opinion of Living Essentials' Expert Cannot Raise a *Genuine* Dispute on This Issue. ...................................................................... 12

    C.  The Evidence Indisputably Establishes the Fourth Element:  That This Price Discrimination "May" Have Caused Competitive Injury. ............. 15

        1.  Plaintiffs Have Established Competitive Injury Through Direct Evidence of Diverted Sales. .............................................................. 15

        2.  Plaintiffs Are Also Entitled to the *Morton Salt* Inference of Competitive Injury. ......................................................................... 18

        3.  There is No Genuine Dispute as to Whether Plaintiffs Compete with Costco. .......................................................................................... 19

        4.  Plaintiffs and Costco are Competitors As a Matter of Law ............. 21

II.   THERE IS NO GENUINE DISPUTE BUT THAT PLAINTIFFS HAVE SUFFERED "ACTUAL INJURY." ........................................................... 23

III.  PLAINTIFFS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT ON THEIR SECTION 2(D) AND UPA CLAIMS. ..................................... 25

CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*,
    135 F. Supp. 2d 1031 (N.D. Cal. 2001) .......................................................... 9

*Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*,
    842 F.2d 578 (2d Cir. 1987) ........................................................................ 19

*Callahan v. A.E.V., Inc.*,
    182 F.3d 237 (3d Cir. 1999) ........................................................................ 16

*City of Pomona v. SQM North America Corp.*,
    750 F.3d 1036 (9th Cir. 2014) ...................................................................... 7

*Diesel Elec. Sales & Serv., Inc. v. Marco Marine San Diego, Inc.*,
    16 Cal. App. 4th 202 (1993) ....................................................................... 25

*Easley v. Flores*,
    No. CV 15-4359-GW(E), 2017 WL 7938602 (C.D. Cal. May 3, 2017) ....... 7

*In re Entropin Sec. Litig.*,
    487 F. Supp. 2d 1141 (C.D. Cal. 2007) ......................................................... 8

*F.T.C. v. Simplicity Pattern Co.*,
    360 U.S. 55 (1959) ....................................................................................... 25

*Falls City Indus., Inc. v. Vanco Beverage, Inc.*,
    460 U.S. 428 (1983) .............................................................................. *passim*

*Fred Meyer, Inc. v. FTC*,
    359 F.2d 351 (9th Cir. 1966) ................................................................. 13, 14

*FTC v. Anheuser-Busch, Inc.*,
    363 U.S. 536 (1960) ..................................................................................... 10

*FTC v. Morton Salt Co.*,
    334 U.S. 37 (1948) .............................................................................. 1, 15, 18

*George Haug Co. v. Rolls Royce Motor Cars Inc.*,
    148 F.3d 136 (2d Cir. 1998) ........................................................................ 19

*Hasbrouck v. Texaco, Inc.*,
    842 F.2d 1034 (9th Cir. 1987) ............................................................ 9, 23, 24

- ii -

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
  451 U.S. 557 (1981) ............................................................................ 8, 23, 24

*Marjam Supply Co. v. Firestone Bldg. Prod. Co.*,
  LLC, No. 2:11-CV-7119, 2019 WL 1451105 (D.N.J. Apr. 2, 2019) ........................... 16

*Matrix Motor Co., Inc. v. Toyota*,
  290 F. Supp. 2d 1083 (C.D. Cal. 2003) ................................................................ 21

*Orr v. Bank of America*,
  285 F.3d 764 (9th Cir. 2002) ................................................................................ 7

*Pet Food Exp. Ltd. v. Royal Canin USA, Inc.*,
  No. CV 09-01483 MHP, 2011 WL 1464874 (N.D. Cal. Apr. 18, 2011) .................... 25

*Philip Morris, Inc. v. Grinnell Lithographic Co.*,
  67 F. Supp. 2d 126 (E.D.N.Y. 1999) ................................................................... 25

*Rebel Oil Co. v. Atlantic Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) .............................................................................. 21

*S.E.C. v. Murphy*,
  626 F.2d 633 (9th Cir. 1980) .............................................................................. 23

*Scott v. Harris*,
  550 U.S. 372 (2007) ...................................................................................... 7, 17

*Video Serv. of Am., Inc. v. Maxell Corp.*,
  2007 WL 2156359 (D.N.J. July 26, 2007) ............................................................ 14

*Yunis v. U.S.*,
  118 F. Supp. 2d 1024 (C.D. Cal. 2000) ................................................................ 16

**Statutes**

15 U.S.C. § 13(a) .................................................................................................... 8

Cal. Bus. & Prof. Code §§ 17070, 17080 .............................................................. 25

California Unfair Practices Act section 17045 ............................................... v, 3, 25

**Other Authorities**

Rule 30(b)(6) ................................................................................................... 6, 19

Rule 56(c)(4) .................................................................................................. 15, 16

## **INTRODUCTION**

This is a price discrimination case brought under the federal Robinson-Patman Act ("RPA") by a group of seven family-owned wholesale businesses who were charged far higher prices for their purchases of 5-hour Energy than their competitor Costco Wholesale Corporation was charged. Plaintiffs bring this action to obtain an injunction against the ongoing price discrimination, and to recover threefold the damages they suffered. The defendant is Living Essentials, the maker of 5-Hour Energy, who established and maintained the discriminatory prices.

The RPA makes it illegal for a manufacturer (known in RPA parlance as a "supplier") to charge higher prices to its "disfavored" customers, while charging lower prices to its "favored" customers, where those two customers are in competition with each other. This illegal pricing strategy is known as "price discrimination." As the RPA's seminal precedent explains:

> The legislative history of the Robinson-Patman Act makes it abundantly clear that Congress considered it to be an evil that a large buyer could secure a competitive advantage over a small buyer solely because of the large buyer's quantity purchasing ability. The Robinson-Patman Act was passed to deprive a large buyer of such advantages except to the extent that [*two statutory defenses not applicable here*].

*FTC v. Morton Salt Co.*, 334 U.S. 37, 43 (1948).

At the heart of the RPA is the recognition that small businesses are a critical component of the American economy, and of the communities in which they compete. Their continued existence and vitality provide healthy competition to large chains, and benefits all consumers. As eloquently stated by Representative Wright Patman, the sponsor of the Act:

> In the field of merchandise distribution a Goliath stands against divided forces, plying a powerful weapon with a skillful hand against the vulnerable weaknesses of his opponents. The Goliath is the huge chain

stores, sapping the civic life of local communities with an absentee overlordship, draining off their earnings to his coffers, and reducing their independent business men to employees or to idleness.

*Remarks of Rep. Wright Patman*, 79 Cong. Rec. 9077 (June 11, 1935).

Other supporters explained that among the RPA's express purposes is the protection of small businesses. That goal was not rooted in charity, however. It was rooted in what Congress perceived as the importance of small businesses to the fabric of American society:

[The purpose] is not to protect an individual, it is not to give the little fellow more money, it is not to take something from somebody else, but it is to build strong again the foundation of our Government and our civilization. That is the job presently before us. You cannot have it with a few great economic overlords to whom everybody else owes economic allegiance. . . The American people are not going to stand for a few lords of industry destroying this country [Applause].

*Remarks of Rep. Sumners, Debate in the House of Representatives on H.R. No. 8442*, 80 Cong. Rec. 8109 (May 27, 1936).

Plaintiffs are among those Americans who will not stand to be discriminated against in favor of giant corporations. Plaintiffs are exactly the type of small, local, community-owned businesses that Congress sought to protect with the RPA. They are wholesalers that supply local, independent grocery stores, convenience stores, and gas stations with the array of products those retailers stock on their shelves.

The favored customer, Costco Wholesale Corporation, competes with Plaintiffs for that same segment of business. In particular, the Costco Business Center division of that corporate giant specifically targets small "mom and pop" retail convenience stores as its main customer group—the exact customers targeted by the Plaintiff-businesses.

In this motion for partial summary judgment, Plaintiffs demonstrate that

there is no genuine dispute of material fact as to whether (1) they are entitled to a permanent injunction against further discrimination, and (2) they are entitled to summary adjudication of Living Essentials' liability under section 2(a) of the Act (as well as under section 2(d) of the Act, and § 17045 of the California Unfair Practices Act).  The only issue as to which there is a *genuine* dispute of fact concerns the amount of damages Plaintiffs are to recover.

## STATEMENT OF FACTS

### A.    The Parties

Living Essentials manufactures 5-hour Energy, the ubiquitous "energy drink."  (Statement of Uncontroverted Facts ("SUF") ¶ 1.)  Plaintiffs are wholesalers that purchase 5-hour Energy from Living Essentials for re-sale to a variety of retail businesses—gas stations, convenience stores, and liquor stores, as well as to other smaller wholesalers.  (*Id.* ¶ 2).

### B.    Living Essentials Sells 5-hour Energy to Plaintiffs and to Costco.

Plaintiffs' purchases of 5-hour Energy are facilitated by Living Essentials' broker, Paramount Sales Group.  (SUF ¶3.)  Paramount is a Pasadena-based broker, run by the "Riffle" family.  (*Id.* ¶ 4.)  Paramount and the Riffles are responsible for sales to Plaintiffs, and to other similar wholesalers that Living Essentials classifies as "convenience store wholesalers" ("C-store wholesalers").  (*Id.* ¶ 5.)

Living Essentials also sells 5-hour Energy to Costco Wholesale Corporation.  Both Paramount and Living Essentials' executives acknowledge the reality that Costco competes with Plaintiffs for sales to the convenience store market, and describe it as a "C-Store wholesaler."  (*Id.* ¶ 6 ("Costco Business Center ***is the only C-Store wholesaler*** that receives and promotes deals on open stock 5-hour Energy."); *id.* ("Q:  this C-store wholesaler, that's Costco that you're referring to? A:  I'm referring to Costco Business Center."); *id.* (referring to the CBC chain as "this C-store wholesaler").)

C.    **Living Essentials Engages in Price Discrimination.**

There are two tiers of pricing at play in this lawsuit:  the "list price" for 5-hour Energy, and the "net price."  Plaintiffs are discriminated against on both.  For list prices, Plaintiffs are charged a **$.10**/bottle higher price.  They pay **$1.45** and **$1.60** for regular and "extra-strength" 5-Hour Energy respectively, while Costco pays just **$1.35** and **$1.50**.  (SUF ¶¶ 7-8.)

From those discriminatory list prices, three deductions are available to Plaintiffs, to arrive at their net price:  (1) a $.07/bottle "everyday discount" on all purchases, (2) a ███████████████ if they pay within 10 days of invoicing, and (3) an additional $.07/bottle rebate on certain "display racks" and "refill kits," that were periodically made available.  (*Id.* ¶ 9.)  Generally, the Plaintiffs' display purchases were restricted to "around 10 percent" of their total volume.  (*Id.* ¶ 10.)

Living Essentials' expert witness Dr. Williams has calculated the "net prices" received by each Plaintiff in each year at issue.  (*Id.* ¶ 11.)  For *every* Plaintiff, Dr. Williams finds multiple years in which its net price was ███████ for regular, and ███████ for extra-strength.  (*Id.*)

As for Costco, from its list price of ███████, Dr. Williams recites that Costco received a ███████████ for payments made within 37 days of invoice, and a ███████████████ (*Id.* ¶ 12.)  Per Dr. Williams, those discounts resulted in a ███████ "net price" to Costco.  (*Id.*)

If one stops there, as Dr. Williams does, it appears that the amount of the discrimination is just ███████ per bottle.  But Living Essentials gave many other discounts and promotional payments to Costco that Dr. Williams conspicuously omits from his calculations.  Chief among them were the series of IRC ("Instant Rebate Coupon") programs to Costco that ranged in value from ███3.██ per 24-pack (███/bottle) to ███ per 24-pack (███/bottle) over the damages period.  (SUF ¶ 13.)  As acknowledged by Living Essentials' Director of Sales Operations, these IRCs were given to Costco "███████████████."  (*Id.* ¶ 14.)  Under

1  that form of discount, when the 5-hour Energy bar code was scanned at Costco's

2  register, ████████████████████████████████████████████████████

3  ████████████████████████████████████████████████

4  ████████████████████████████  (SUF ¶ 15.)

5        When the $7.20 IRC was in effect, for example, the associated $.30/bottle

6  discount meant that Costco paid a net price of a mere **$1.05**/bottle for regular

7  strength 5-hour Energy, while Plaintiffs paid **$1.38** for the same bottle.  Plaintiffs

8  and other non-chain wholesalers were never offered IRCs.  (*Id*. ¶ 16.)

9        As noted above, the only rebate ever available to Plaintiffs and other non-

10  chain wholesalers was the $.07/bottle rebate on limited quantities of "display

11  racks."  (*Id*. ¶ 17.)  But while Dr. Williams *includes* this $.07/bottle rebate as a "Bill

12  Back" when he calculates Plaintiffs' "net price," (*id*. ¶ 11), he *excludes* both the

13  IRC rebates and *all* of the other forms of "bill backs" that Living Essentials paid to

14  Costco.  (*id*. ¶ 12)

15        Living Essentials produced a spreadsheet compiling all of the "bill backs" it

16  paid to Costco.  (SUF ¶ 18.)  That undisputed evidence shows that Living

17  Essentials paid Costco a total of ████████ in "bill backs" over the relevant period.

18  (*Id*.)  It produced a similar spreadsheet for each Plaintiff, showing total "bill backs"

19  to each Plaintiff (primarily the $.07/bottle rebates for display racks) as follows:

20        U.S. Wholesale:          ████████     L.A. Top:                    $████████

21        Trepco:                        ████████     L.A. Int'l:
         YNY:                                               California Wholesale:     ████████

22

23        S.D. Cash & Carry:    $████████     **Total**:                   ████████

24   (*Id*. ¶ 19.)

25        This ███-fold discrepancy in bill backs between the *combined* tally for all

26  seven Plaintiffs and Costco is not explained by Costco's volume of 5-hour Energy

27  purchases.  Costco purchased a total of ████████ bottles over the period.  (*Id*. ¶

28  20.)  Plaintiffs purchased a combined total of ████████ bottles.  (*Id*. ¶ 21.)  That

1   is, Costco sold roughly four times the volume that Plaintiffs sold, but received █████

2   times the volume of bill backs.  Viewed another way, Plaintiffs on average received

3   a Bill Back of just █████ **bottle**, bringing their "net price" to the ███████ that Dr.

4   Williams calculates.  (*Id.* ¶ 11.)  Costco, on the other hand, received bill backs

5   averaging ████ **/bottle**, which Dr. Williams chooses to ignore when calculating

6   Costco's net price.  (*Id.* ¶ 12.)

7        **D.    Costco Sells 5-hour Energy to Plaintiffs' Customers.**

8        Costco operates two forms of stores that are relevant here.  Its "regular

9   format" stores are the ubiquitous stores that end consumers are familiar with.  But

10  Costco also operates a chain branded the Costco Business Centers ("CBCs"), whose

11  "target customers" (according to Costco's Rule 30(b)(6) witness) are "the Mom &

12  Pop C-store." *i.e.*, the same retail customers targeted by Plaintiffs.  (SUF ¶ 22.)

13       There are currently seven CBCs in California—two in the Bay Area at

14  Hayward and South San Francisco, and five in Southern California, at San Diego,

15  Hawthorne, Commerce, Westminster, and Burbank.  (*Id.* ¶ 23.)  Costco sold 5-hour

16  Energy in the CBCs throughout the period, while it sold the product in its "regular

17  format" stores up through February 2013, and again between ██████.  (*Id.* ¶ 24.)

18       The evidence shows that sales of 5-hour Energy from both types of Costco

19  stores were overwhelmingly made to convenience stores.  According to an estimate

20  by Mr. Eaves (Living Essentials' National Account Manager for 5-hour Energy

21  sales to California wholesalers for the past eight years), ***90% of Costco's sales of 5-***

22  ***hour Energy were to convenience stores***.  (SUF ¶ 26 ("wholesalers, cash and

23  carry's and clubs all sell +90% of 5-hour Energy Shots to the C-stores").)

24       Living Essentials was aware that the discounts and promotions it gave to the

25  CBC chain were adversely affecting the business of the independent wholesalers, as

26  its executives acknowledged internally:  "If I was an Independent retailer I would

27  buy my 5 Hour Energy at Costco…. They can get at Costco for .27 cent less per

28  bottle!"  (*Id.* ¶ 27.)  As Paramount described it, the discrimination "drives retailers

to the [Costco] business centers where they are able to stock up on each of the flavors at a big saves vs what they pay from a wholesaler." (*Id.* ¶ 28.)  Mr.  Eaves reiterated over a year later:  "The ***wholesalers' customers will not buy from them*** since they can get it cheaper at Costco."  (*Id.* ¶ 29 (emphasis added).)

As will be seen in the parties' briefing, there is *no* evidence disputing these statements.

## **LEGAL STANDARDS**

"A party is entitled to summary judgment if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' "  *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (citing Fed. R. Civ. P. 56(a).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis upon which a reasonable jury could return a verdict for the nonmoving party.  *Easley v. Flores*, No. CV 15-4359-GW(E), 2017 WL 7938602, at *4 (C.D. Cal. May 3, 2017) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Especially pertinent here is the Supreme Court's most recent clarification of the summary judgment standard:

> '[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no **genuine** issue of material fact.'  When opposing parties tell two different stories, **one of which is blatantly contradicted by the record**, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."

*Scott v. Harris*, 550 U.S. 372, 380 (2007) (alteration and first emphasis in original).

Also pertinent here is the rule that documents produced by a party opponent in the course of discovery are admissible and self-authenticating for purposes of summary judgment.  *Orr v. Bank of America*, 285 F.3d 764, 777 n.20 (9th Cir.

2002); *In re Entropin Sec. Litig.*, 487 F. Supp. 2d 1141, 1143 n.1 (C.D. Cal. 2007).

<u>**ARGUMENT**</u>

There is overwhelming, undisputed evidence that Living Essentials gave secret, more favorable pricing to Costco than it gave to Plaintiffs.  Under binding Ninth Circuit and Supreme Court precedent, there is no genuine dispute of material fact as to Living Essentials' liability and, consequently, Plaintiffs' entitlement to a permanent injunction prohibiting the ongoing discrimination.  There is also no genuine dispute in the record as to the fact that Plaintiffs suffered actual injury, entitling them to damages under the Clayton Act.  The only issue over which there is a genuine dispute is the *amount* of those damages.

## I.    PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF BECAUSE THERE IS NO GENUINE FACTUAL DISPUTE AS TO ANY OF THE FOUR ELEMENTS OF SECTION 2(a) LIABILITY.

To establish liability under Section 2(a) of the RPA, Plaintiffs must "show that (1) the relevant . . . sales were made in interstate commerce; (2) the [goods] were of like grade and quality; (3) [Living Essentials] discriminated in price between [the plaintiff] and another purchaser of [5-hour Energy]; and (4) the effect of such discrimination may be . . . to injure, destroy, or prevent competition to the advantage of a favored purchaser." *Volvo Trucks*, 546 U.S. at 176-77.

The RPA has been continuously described by the Supreme Court as a "prophylactic" statute.  *See, e.g.*, *Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 435 (1983); *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 561 (1981).  Section 2(a)'s prohibition is against price discrimination that "may" harm competition.  15 U.S.C. § 13(a).  As such, "the statute does not require that the discriminations must in fact have harmed competition." *J. Truett Payne*, 451 U.S. at 562.  Instead, it requires only "a reasonable possibility that a price difference may harm competition." *Falls City*, 451 U.S. at 434-35.

This "reasonable possibility of harm" is the only degree of "competitive

injury" required under the RPA, and "is sufficient to support injunctive relief." *Id.* at 435.  Upon showing discrimination that "may" harm competition, the plaintiff *is* entitled to an injunction, with "further inquiry by the courts into whether the plaintiff is entitled to treble damages under § 4 of the Clayton Act."  *Id.*

The low hurdle to issuance of an injunction against price discrimination was summarized by the Ninth Circuit in its leading case on the RPA:  "Under section 2(a), all that is required to establish illegal price discrimination is proof that competitive injury ***may*** result.  Once such a showing is made, ***the plaintiff is entitled to an injunction*** preventing defendant from engaging in the anti-competitive conduct."  *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1042 (9th Cir. 1987) (first emphasis in original); *see also Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1037 (N.D. Cal. 2001) ("[P]laintiffs do not have to show that they suffered actual injury in order to obtain injunctive relief under the Robinson-Patman Act.  Instead, plaintiffs <u>must show only</u> that there is a reasonable possibility that the unlawful price discrimination received by defendants ***may*** harm competition.") (second emphasis in original).

As shown below, because there is no genuine factual dispute as to any of the four elements of liability under section 2(a), and because neither proof of antitrust injury nor actual damages is required for an injunction, Plaintiffs *are* entitled to a permanent injunction prohibiting Living Essentials from charging Plaintiffs a higher net price than it charges to Costco.

### A.  The First Two Elements of Liability are Established By Living Essentials' Admissions.

Living Essentials admits the first element, interstate commerce in 5-hour Energy.  (SUF ¶ 30.)  It also admits that all 5-hour Energy is sold in identical 1.93-ounce bottles, establishing the second element ("like grade and quantity").  (*Id.* ¶ 31.)  Beyond the physical identity of the commodity, the unit of pricing for both Plaintiffs and Costco is *per bottle*.  (*Id.* ¶ 32.)

**B.** **There Is No Genuine Dispute as to the Third Element: That Living Essentials Discriminated In Price Against Plaintiffs in Favor of Costco.**

Per the Supreme Court, "a price discrimination within the meaning [of section 2(a)] is *merely a price difference*." *FTC v. Anheuser-Busch, Inc.*, 363 U.S. 536, 549 (1960) (emphasis added). As recited above, Living Essentials charged Costco a list price of $1.35/$1.50 per bottle for regular and extra strength, while it charged Plaintiffs ten cents more—$1.45/$1.60. (SUF ¶¶ 7-8.) Plaintiffs received a $.07/bottle "everyday discount" from their list price (*id.* ¶ 9), leaving Costco with a $.03/bottle price advantage even *before* accounting for the additional bill backs it received. When accounting for the ████████ in "bill backs" that Living Essentials paid to Costco (*id.* ¶ 18), the delta between the "net price" paid by Costco versus Plaintiffs is of course much greater.

But even ignoring the bill backs, the $.03 base price difference is crucial in this market. This is a marketplace in which—according to Living Essentials' employee tasked with *managing* it—"for a penny [market participants] would go somewhere else and buy it if they get a penny cheaper." (*Id.* ¶ 33; *see also id.* ("When [a wholesaler] runs a lower price or, you know, even a penny or two, they'll – they'll hear from their customer saying, hey, so and so is selling it for a cheaper price."). As Paramount explained with respect to a C-store wholesaler in Northern California: ████████████████████████████ ████████████████████████ " (SUF ¶ 34; *id.* ¶ 35 ("Customers are sensitive to pricing. . . . Everybody is looking for the cheapest price.").)

1. The Record Evidence Uniformly Establishes that There was Price Discrimination.

While the element of price discrimination is satisfied by the simple facts above, it is perhaps comforting to see that *every* document and contemporaneous statement in the record agrees that Costco received discriminatory pricing. Stated

- 10 -

conversely, Living Essentials will not be able to identify a *single* contemporaneous record that creates a *genuine* factual dispute over this third element of liability.

A sample of that contemporaneous record evidence follows:

| Summary | SUF |
|---|---|
| In August 2012, Living Essentials internally calculated Costco's "net price per bottle" (across regular and extra strength) as **$1.12**.<br><br>In comparison, Dr. Williams calculates the lowest "net price" for *any* Plaintiff in 2012 as **$1.33** for regular, and **$1.48** for extra strength. | ¶ 36 |
| Steve Ramsey, Living Essentials' Vice President of Sales to the C-store channel, testified that he "believed that there was a connection between Costco's low pricing and the decline in some of Clark's key [wholesalers]." | ¶ 37 |
| In July 2015, Kevin Riffle of Paramount suggested to Living Essentials' Director of Sales Operations that "I think a solution to this would be to mirror the promotion to wholesalers that are in the same market as the Costco Business Centers.  I think if we are able to do this, we would really motivate our wholesalers to sell more 5-hour Energy :)."<br><br>In the same email chain, Mr. Ramsey acknowledged that Costco has a "much lower cost of goods" than the Plaintiff wholesalers have, and that "we are trading several direct buying customers to *a much lower cost of goods through Costco* business centers."  (emphasis added).<br><br>In the same chain, Vince Sullivan—Living Essentials' Director of Sales for Convenience Stores in the western U.S.—summarized:  "Bottom line we are getting the business, but *it is far less profitable business!*" (emphasis added). | ¶ 38 |
| In August 2015, Mr. Sullivan calculated a **$.12**/bottle difference between the price wholesalers were *paying* for 5-hour Energy, and the price at which Costco was *selling* it. | ¶ 39 |
| In August 2015 the Riffles forwarded an email announcing a $5.00 IRC program for Costco to Mr. Eaves, who reported to Mr. Sullivan:  "This [is] getting ridiculous.  This is at least their 3rd promotion in 5 months.  *We need to be on an equal playing field.*" (emphasis added) | ¶ 40 |

| Summary | SUF |
|---|---|
| In September 2015 the Riffles forwarded another $6.00 IRC program for Costco, prompting Mr. Sullivan to retort, "I have now lost count on how many promotions this has been just in the past 6 months. 5?"<br><br>Mr. Sullivan testified as to his goal: "I was pointing that out to him [Mr. Ramsey] so that he could elevate it and ***make sure that everyone knows what the pricing differences are between Costco Business Center and the wholesalers***." (emphasis added) | ¶ 41 |
| Half a year later, in April 2016, Mr. Ramsey noted that Costco was receiving a $7.20 rebate, such that it was selling the product for "$1.20 a bottle" at the "Costco near my house," and expressed his own incredulity to Ms. Meguiar: "Was it supposed to go out at this low a coupon rate?" Mr. Ramsey testified that he thought "there might have been some mistake that it had gone out at that low of a coupon rate." | ¶ 42 |

Simply put, there is not a single record document or contemporaneous statement to dispute what Mr. Sullivan described as a fact that by September 2015 "everyone knows"—*i.e.*, "what the pricing differences are between Costco Business Center and the wholesalers." (SUF ¶ 41).

This indisputable fact was well-summarized a year later in an August 2016 email that Living Essentials' Vice President Scott Allen sent to the broker that Living Essentials had engaged to facilitate sales to Costco: ███████████ ███████████████████████████████." (*Id.* ¶ 43 (emphasis added).)

        2.    The Opinion of Living Essentials' Expert Cannot Raise a *Genuine* Dispute on This Issue.

To refute the element of price discrimination, the only thing that Living Essentials will be able to point to is the opinion of its expert, Dr. Williams. As shown in the *Statement of Facts* above however, the only way that Dr. Williams can reduce the magnitude of the discrimination to the ██████ per bottle he found is by *counting* the ██████ in bill backs that Living Essentials paid to Plaintiffs combined, while *excluding* the ██████ in bill backs that it paid to Costco.

1   (*Supra* at 5.)  When the bill backs are included for both, Plaintiffs' expert Dr.

2   DeForest McDuff calculated that Costco's favoritism ranged from ▮▮▮▮ per

3   bottle over the several years at issue—roughl ▮▮▮.  (SUF ¶ 44.)  Just as Mr.

4   Allen contemporaneously summarized, Costco has continuously received "▮

5   ▮▮▮▮▮▮"  (*Id.* ¶ 43.)

6        Chief among the bill backs that Dr. Williams excludes are the $3.00-$7.20

7   IRC rebates that Costco paid to Living Essentials for each 24-pack it sold (*i.e.*, 13¢-

8   30¢ per bottle).  Dr. Williams excludes the millions of dollars that Living Essentials

9   paid Costco for IRCs on the specious ground that in his opinion, those payments do

10  not meet ▮▮▮▮▮▮▮▮▮"—a term that he neither

11  defines, nor attributes to any source.  (SUF ¶ 45.)  That is, in Dr. Williams' opinion,

12  when Costco pays Living Essentials $36 for a 24-pack, and then Living Essentials

13  turns around and gives $6 back to Costco, Costco's "net price" for that item is not

14  $30, but remains $36.  That is, Dr. Williams' math is:  $36.00 - $6.00 = $36.00.

15       Plaintiffs will leave it to Living Essentials to try to explain Dr. Williams'

16  unintelligible mathematics.  But that legerdemain need not detain the Court,

17  because as a matter of law, rebates *are* a form of price discrimination under section

18  2(a).  In *Fred Meyer, Inc. v. FTC*, 359 F.2d 351 (9th Cir. 1966), the favored

19  purchaser likewise tried to argue that rebates from the supplier should not be

20  counted toward its net price; an argument the court rejected, holding that rebates

21  given exclusively to the favored purchaser are "outright price concessions," and

22  "since the amounts were directly related to and dependent upon the amount of

23  goods purchased and resold by [the favored purchaser]," they were "price

24  concessions cognizable under section 2(a)" of the RPA.  *Id.* at 362.  Similarly, in

25  *Whitaker Cable Corp. v. FTC* the Seventh Circuit affirmed a section 2(a)

26  enforcement action where the "variations in net price resulted primarily from the

27  application of a rebate schedule."  239 F.2d 253, 254 (7th Cir. 1956).

28       More recently in *Mathew Enter., Inc. v. Chrysler Grp. LLC*, the Northern

District of California held that "[p]rice, for purposes of the RPA, refers to the net amount paid by the buyer, *taking into account any rebates* or discounts also provided to that buyer by the seller." 2015 WL 3664843, at *3 (N.D. Cal. Jan. 12, 2015).  As the *Mathew* court explained:  "Thus, a company that provides goods or commodities at the same retail price to two purchasers can run afoul of the RPA in circumstances where only one of those purchasers is offered direct or indirect rebates or discounts that lower the net price paid for the goods." *Id.*  That is precisely the situation here. *See also Video Serv. of Am., Inc. v. Maxell Corp.*, 2007 WL 2156359, at *3 (D.N.J. July 26, 2007) (emphasis added) ("In determining whether or not there is a price difference, *it is necessary to look at* the 'net' price paid by the purchasers, meaning that *the Court must consider all applicable discounts, rebates*, offsets, incentives, credits, etc. provided by the seller to the purchaser.") (collecting citations, emphasis added).  Finally, the coup de grâce is found in *ABC Distributing, Inc. v. Living Essentials*, where on this precise issue, the court cited *Fred Meyer* to conclude:  "the Court agrees with Plaintiffs that [the IRC] *rebates must be factored into the net price for purposes of RPA § 2(a).*" 2017 WL 3638443 (N.D. Cal. Sept. 1, 2017) (emphasis added).

An expert's unsupported opinion that the law is wrong does not create a *genuine* dispute of material fact sufficient to preclude summary judgment.  Dr. Williams describes the IRCs as "Instant Rebate Coupons," and agrees that they amounted to "$███████ per bottle." (SUF ¶ 47.)  But other than arguing that the rebates shouldn't be *counted* toward Costco's net price, Dr. Williams has nowhere disagreed with Dr. McDuff's calculation that when the rebates *are* counted, Plaintiffs faced a net price discrimination that was (and remains) roughly $.██ bottle, or ██% of the price of a bottle of regular strength 5-hour Energy. (SUF ¶ 48.)

The final nail in the coffin for Dr. Williams' opinion that the IRCs should be excluded from Costco's net price comes from Living Essentials itself.  In the "█

1  ████████████████████████████████████████████
2  ████████████████████████████████████████████
3  ████████████████████████████ (*Id.* ¶ 49.)  That is, Living

4  Essentials' own math is that $36.00 - $6.00 = $30.00.  So in addition to

5  contradicting the precedent, Dr. Williams' opinion that $36.00 - $6.00 = $36.00

6  contradicts his own client's accounting.

7      While a jury is still necessary to determine the amount of *damages* Plaintiffs

8  are entitled to, there is no genuine dispute on the *element* of price discrimination,

9  which requires "merely a price difference."  *Falls City*, 460 U.S. at 443 n.10.

**C.    The Evidence Indisputably Establishes the Fourth Element:  That This Price Discrimination "May" Have Caused Competitive Injury.**

The final element to establish Living Essentials' liability is to show that "the effect of such discrimination may be…to injure, destroy, or prevent competition." *Volvo*, 546 U.S. at 176-77.  "Competitive injury" can be established in two ways: (1) directly, through evidence of "diversion of sales or profits," or (2) indirectly, through evidence that a "favored competitor received a significant price reduction over a substantial period of time [*i.e.*, the *Morton Salt* inference]."  *Volvo*, 546 U.S. at 177 (citing *Morton Salt Co.*, 334 U.S. at 49-51.)  There is no genuine dispute in the *evidence* that both alternative forms of proof are present here; the only dispute concerns the *degree* of injury, which will be for the jury to decide.

**1.    Plaintiffs Have Established Competitive Injury Through Direct Evidence of Diverted Sales.**

The record contains extensive evidence of diverted sales from Plaintiffs to Costco.  Plaintiffs have obtained dozens of declarations, signed under penalty of perjury by their customers, who attest that they periodically bought 5-hour Energy from Costco—instead of Plaintiffs—*because* of Costco's lower pricing.  (SUF ¶¶ 51-57.)  The declarations are based on personal knowledge and set forth facts establishing the declarant's competency to testify, and thus are admissible per Rule

56(c)(4).  Fed. R. Civ. Proc. 56(c)(4); *Yunis v. U.S.*, 118 F. Supp. 2d 1024, 1030 (C.D. Cal. 2000) ("To be admissible for purposes of summary judgment, declarations [] must be based on personal knowledge, must set forth 'such facts as would be admissible in evidence,' and must show that the declarant [] is competent to testify concerning the facts at issue.").

In addition, each of the Plaintiffs testified as to how they lost customers of 5-hour Energy to Costco, and as to their personal observations of customers refusing to buy from them when the CBCs were receiving an IRC on 5-hour Energy.  (SUF ¶¶ 51-57.)  Plaintiffs' testimony is admissible to establish that Costco's price advantage was their customers' motivation to purchase 5-hour Energy from CBC instead of them.  *Marjam Supply Co. v. Firestone Bldg. Prod. Co.*, LLC, No. 2:11-CV-7119, 2019 WL 1451105, at *4 (D.N.J. Apr. 2, 2019) (finding, in an RPA action, the plaintiff's testimony regarding its customers' statements "admissible to evidence [plaintiff's] customers' motives for switching distributors."); *see Callahan v. A.E.V., Inc.*, 182 F.3d 237, 252 (3d Cir. 1999) (accepting hearsay evidence for the purpose of proving customer motive).  For example, the owner of Trepco testified that "the reason why these people are on the list is because of observations by our salespeople, as well as interviews with the retailers who freely admitted to buying the item from Costco for purposes – ***because of pricing***."  (SUF ¶ 51.)

As another example, the owner of San Diego Cash and Carry testified as follows:

> Q: How did you identify those customers to include in the list that you're talking about?
>
> A: Those are those ones that have complained.  I've asked.  You know you wanted to prove that some customers are buying it from Costco. So I would ask customers, "Hey do you buy 5-hour from Costco?" They said, "Yes."
>
> "Why do you buy from Costco?"

"Cause it's cheaper."

(*Id.* ¶ 52 (emphasis added).)  Likewise, the owner of U.S. Wholesale testified:

> Q: Do you know of U.S. Wholesale customers that have gone to Costco
> and bought 5-hour Energy instead of buying it from U.S. Wholesale?
>
> A: *Yes*.
>
> ***
>
> Q: … how do you know that?
>
> A: Some of them, I see them there [at CBC] when I'm buying it. … But
> when I go there to pick you (sic) 5-hour, I do see our customers in line
> behind me, on the other checkouts.  Plus, ***they tell us also.  They give
> us an opportunity to match, and we don't, and then they go there***.

(*Id.* ¶ 53 (emphasis added).)  The other Plaintiffs testified similarly. (*Id.* ¶¶ 54-57.)

And of course, as already previewed, there is also a wealth of evidence of diverted sales in Living Essentials' own records.  Clark Eaves reported to Living Essentials' Director of Sales Operations Sue LeBeau that "[t]he wholesalers' customers will not buy from them since they can get it cheaper at Costco."  (*Id.* ¶ 29.)  And as Paramount described it, the discrimination "drives retailers to the [Costco] business centers where they are able to stock up on each of the flavors at a big saves vs what they pay from a wholesaler."  (SUF ¶ 28.)  As Paramount's President Kevin Riffle further described:  "█████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████  (*Id.* ¶ 58.)

On this record, there is no serious question whether diverted sales occurred, and Living Essentials' anticipated *ipse dixit* rejoinder that sales were *not* diverted is insufficient to create a *genuine* dispute.  *See Scott*, 550 U.S. at 380 (holding that where one side's "story" at summary judgment is "blatantly contradicted by the record," the court can summarily reject "that version of the facts").

2.    <u>Plaintiffs Are Also Entitled to the <i>Morton Salt</i> Inference of Competitive Injury.</u>

The leading case of *FTC v. Morton Salt Co.* established the "self-evident" proposition that "competition may be adversely affected by a practice under which manufacturers and producers sell their goods to some customers substantially cheaper than they sell like goods to the competitors of those customers." 334 U.S. at 50. As the Supreme Court articulated the *Morton Salt* inference in its most recent RPA case, the "inference of competitive injury under *Morton Salt* arises from 'proof of a substantial price discrimination between competing purchasers over time.'" *Volvo*, 546 U.S. at 179.

As explained in Part I.B.2 above, rebates paid to a favored purchaser *must* be included for purposes of section 2(a) liability, and Living Essentials' expert witness did not offer any rebuttal to the calculations offered by Plaintiffs' expert, showing a persistent ▮▮▮ favoritism to Costco when the bill backs for the IRCs are included. (SUF ¶¶ 46-48, 50). While *Morton Salt* did not establish a specific percentage as the threshold for "substantiality," the degree of discrimination here greatly exceeds that which satisfied the Supreme Court as a matter of law in *Morton Salt*. The discriminatory prices in *Morton Salt* are displayed in a chart on page 41 of the opinion, and the Court's analysis "singled out" the "ten-cent [ ] price differential" between the "carload" price of $1.50 per case, and the "less-than-carload" price of $1.60. 334 U.S. at 41, 47-48. The Court held that that 6.6% price differential was sufficient to infer competitive injury as a matter of law. *Id.* at 48 ("a ten-cent carload price differential against a merchant would injure him competitively just as much as a ten-cent differential under any other name."). Here, the degree of discrimination is more than *double* that amount, has persisted over the entire limitations period, and is ongoing through today.

In addition, *all* of the contemporaneous evidence recognizes that Living Essentials' favoritism of the chain of CBCs *was* harmful (let alone "may" have

1  been harmful) to Plaintiffs. *See* Part II, *infra*. Most pertinent for this procedural

2  posture, there is not a ***single*** record refuting any of the avalanche of candid, internal

3  observations that Plaintiffs were competitively harmed.

4          3.    <u>There is No Genuine Dispute as to Whether Plaintiffs Compete</u>

5              <u>with Costco.</u>

6        Finally, to establish competitive injury, a plaintiff must prove that "it was

7  engaged in actual competition with the favored purchaser(s) as of the time of the

8  price differential." *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 842 F.2d

9  578, 584 (2d Cir. 1987); *Volvo Trucks*, 546 U.S. at 177 ("Absent actual competition

10  with a favored Volvo dealer, however, Reeder cannot establish the competitive

11  injury required under the Act."). "Determining the presence or absence of

12  functional competition between purchasers of a commodity is simply a factual

13  process which focuses on whether these purchasers were directly competing for

14  resales among the same group of customers." *George Haug Co. v. Rolls Royce*

15  *Motor Cars Inc.*, 148 F.3d 136, 141-42 (2d Cir. 1998) (citing *FTC v. Fred Meyer,*

16  *Inc.*, 390 U.S. 341, 349 (1968)).

17        There is no genuine factual dispute in the record evidence as to whether the

18  Plaintiffs and Costco "directly compet[e] for resales [of 5-hour Energy] among the

19  same group of customers." *Id.* Dozens of Plaintiffs' customers attested under

20  penalty of perjury that they switched their purchasing from Plaintiffs to Costco due

21  to the latter's price advantage. (SUF ¶¶ 51-57.) Each Plaintiff testified that it sells

22  5-hour Energy to retailers such as mom and pop convenience stores and that it

23  considered Costco to be a competitor for those same customers. (*Id.* ¶¶ 2, 59.)

24  Costco's Rule 30(b)(6) representative Larry Fell, who has been a buyer for CBC for

25  17 years, testified that the CBCs' ███████████████████ M█████████

26  █████████████████ (*Id.* ¶ 22.) Indeed, according to an estimate by Living

27  Essentials' National Account Manager who has been managing 5-hour Energy sales

28  in California for the past eight years, 90% of Costco's sales of 5-hour Energy are to

convenience stores.  (*Id.* ¶ 26 ("wholesalers, cash and carry's and clubs all sell +90% of 5-hour Energy Shots to the C-stores").)

In addition, the Plaintiffs have learned from their own experience running their businesses that they compete with Costco.  (SUF ¶ 59.)  Living Essentials' employees say the same thing.  (*Id.* ¶ 60 (Mr. Sullivan listing Plaintiffs as among the "wholesalers that cater to jobbers and independent retailers, ***the same group that Costco Business Center and Sams sell to***.") (emphasis added).)  The brokers who have managed Living Essentials' sales to wholesalers in California since the product's inception also say the same thing.  (*Id.* at 3 (listing "LA International," "LA Top," "US Wholesale," and "YnY International" on a chart of customers and stating: "***These customers directly compete with Costco Business Centers.***") (emphasis added).)

If those narrative descriptions by Mr. Sullivan and Mr. Riffle weren't enough, Mr. Eaves helpfully drew a picture as ▮▮▮▮▮▮▮▮▮▮▮▮▮:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(SUF ¶ 61.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Of the dozens of internal commemorations of Costco's price advantage, and the multiple assertions that Plaintiffs and other wholesalers were losing sales as a result of that competition, there is not a single instance in which anyone ***ever***

expressed disagreement with the obvious fact that wholesalers like these Plaintiffs compete with Costco for sales of 5-hour Energy to the same pool of customers. The only evidence in the record is that they *are* competitors.

Notably, while most of the evidence in this case concerns the Costco Business Center format, there is also no dispute that during the brief periods when 5-hour Energy was sold in the "regular format" Costco stores, those sales were *also* in competition with Plaintiffs. For example, in April 2013, shortly after 5-hour Energy was pulled out of the "regular format" Costcos, Paramount emailed Plaintiff L.A. International to report the development: "FYI, Living Essentials cut off Costco recently . . . This should help boost your sales immediately." (SUF ¶ 62.) Similarly, when 5-hour Energy sales resumed in the regular Costcos in early 2016, Paramount reported to Mr. Sullivan and Mr. Eaves that a customer "

" (*Id.* ¶ 63.)

As with the evidence of price discrimination, Living Essentials cannot overcome the uniform record evidence of competition with the *ipse dixit* of its expert witnesses. Per the Ninth Circuit, "[a]ssertions in expert affidavits do not automatically create a genuine issue of material fact." *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1440 (9th Cir. 1995); *see also Matrix Motor Co., Inc. v. Toyota*, 290 F. Supp. 2d 1083, 1097 (C.D. Cal. 2003). If "the expert opinion is not supported by sufficient facts to validate it in the eyes of the law or when indisputable record facts contradict or otherwise render the opinion unreasonable, summary judgment is appropriate." *Rebel Oil Co.*, 51 F.3d at 1440 (internal quotes and citation omitted).

        4.    Plaintiffs and Costco are Competitors As a Matter of Law

Even if there were a dispute in the factual evidence, Plaintiffs and Costco *are* competitors as a matter of law under Supreme Court precedent adopted specifically for the context of competing *wholesalers*. The Supreme Court held in *Falls City*

that for purposes of the RPA, wholesalers of consumer goods need "not compete for sales to the same retailers" to be in in "actual competition." 460 U.S. at 432. Instead, wholesalers are in competition if end consumers (*i.e.*, the consumers who buy from the wholesalers' retail-store customers) can buy from retailers supplied either by the favored, or the disfavored, wholesaler. *Id.* at 436. Here, there is no genuine dispute over whether Plaintiffs and Costco sell 5-hour Energy to the same general pool of convenience stores. Plaintiffs' expert witness on competition accompanied his report with a series of maps showing the locations of each Plaintiffs' customers in relation to the Plaintiff itself, and to nearby CBCs, showing the overlapping geography. (SUF ¶ 64.) Under *Falls City*, Plaintiffs and the CBCs *are* competitors as a matter of law.[1]

Finally, Plaintiffs' direct evidence of diverted sales also establishes that they compete with Costco as a matter of law: "If Plaintiffs showed competitive injury with evidence of diverted sales or profits, the existence of competition would be unquestioned; by their nature, diverted sales show competition for customers." *ABC Dist., Inc.*, 2017 WL 3838443, at *7.

All of this evidence is perhaps best summarized in an October 2015 email from Paramount's President Kevin Riffle, to Living Essentials' National Account Manager Mr. Eaves. There, Mr. Riffle again recites the discrimination in favor of Costco, and declares that unless the discrimination is stopped, "█████████ ████." (SUF ¶ 65.)

The Court should take Mr. Riffle's frank observation—undisputed by *any*

---

[1] Indeed, the degree of "overlap" present in *Falls City* was not nearly as pronounced as here. There, the favored wholesaler sold to retail stores exclusively in Kentucky, while the disfavored wholesaler sold to retail stores across the state boundary, exclusively in Indiana. 460 U.S. at 431-32. But the wholesalers were nevertheless deemed to be in actual competition with each other, because end consumers could buy from retailers on either side of the state line. *Id.* at 436. Here, of course, there is no complication of a boundary that separates the Costco-supplied convenience stores from the Plaintiff-supplied stores.

record evidence—to heart.  These family-owned wholesalers "don't stand a chance" against Costco unless this discrimination is stopped with an injunction.  *S.E.C. v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980) ("permanent injunctions may be granted on summary judgment, given the proper record.").

## II.    THERE IS NO GENUINE DISPUTE BUT THAT PLAINTIFFS HAVE SUFFERED "ACTUAL INJURY."

To recover damages under the Clayton Act, an RPA plaintiff is required to make "some showing of actual injury and causation."  *Hasbrouck*, 842 F.2d at 1042; *see also J. Truett Payne*, 451 U.S. at 562 ("To recover treble damages, then, a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent.").

As to causation, the Ninth Circuit explains that in RPA actions, "[i]t is enough that the illegality is shown to be a material cause . . . a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4."  *Hasbrouck*, 842 F.2d at 1042 (quoting *Zenith Radio v. Hazeltine Research*, 395 U.S. 100, 125 (1969)).  Once that "'fact of damage'" is demonstrated, then RPA actions (like any other antitrust claim) follow "our traditional rule excusing antitrust plaintiffs from an unduly rigorous standard of proving antitrust injury."  *J. Truett Payne*, 451 U.S. at 565.

Here, there is extensive evidence in the record conclusively demonstrating both that Plaintiffs suffered "actual injury" from the discrimination, and that Living Essentials' "illegality is … a material cause" of that injury.  Plaintiffs testified as to how they lost customers of 5-hour Energy to Costco due to the favorable prices that Costco received.  (SUF ¶¶ 51-57.)

This is in addition to the dozens of declarations (signed under penalty of perjury) from Plaintiffs' customers attesting that they bought 5-hour Energy from Costco *because of* Costco's price advantage.  (*Id.*)

In addition, the record is replete with observational admissions by Living Essentials' *own* employees—and the broker it employed to facilitate its sales—that Plaintiffs suffered actual injury from the discrimination:

- "the [Costco pricing] **drives retailers to the [Costco] business centers** where they are able to stock up on each of the flavors at a big saves vs what they pay from a wholesaler," (SUF ¶ 28 (emphasis added));
- "[t]he wholesalers' **customers will not buy from them** since they can get it cheaper at Costco," (*Id.* ¶ 29 (emphasis added));
- "this is very obvious as to the cause of the Wholesaler decline… **Costco**" (*Id.* ¶ 66 (emphasis in original));
- "**These customers directly compete with Costco Business Centers and have seen sales plummet** as Costco runs 5-Hour at $1.31 Reg Strength and $1.42 on Extra Strength." (*Id.* ¶ 60 (emphasis added).)

Tellingly, this last quote is followed by *a list that includes four of these Plaintiffs*. (*Id.* at 3.) And the other three Plaintiffs are specifically listed earlier in that chain, as selling to "independent retailers, the same group that Costco Business Center and Sams sell to," with the observation that "hot deals at Costco Business Centers has negatively effected [sic] [them]." (*Id.* at 1-2.) Paramount followed up six months later, reporting to Mr. Eaves, "█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *n*." (SUF ¶ 67 (emphasis added).) The email also attaches ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ (*Id.*)

Under Supreme Court and Ninth Circuit precedent, the record before the Court indisputably establishes Plaintiffs' "fact of damage," and that the discrimination "is shown to be a material cause." *J. Truett Payne*, 451 U.S. at 567 n.5; *Hasbrouck*, 842 F.2d at 1042. Critically for this procedural posture, there is no *evidence* in the record to create a genuine factual dispute over these issues.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## III.   PLAINTIFFS ARE ENTITLED TO PARTIAL SUMMARY JUDGMENT ON THEIR SECTION 2(D) AND UPA CLAIMS.

The elements of an RPA Section 2(d) claim are satisfied by the same evidence described above.  *See Tri-Valley Packing Ass'n*, 329 F.2d at 707-08.  And importantly, a section 2(d) claim does not require proof of injury to competition. *F.T.C. v. Simplicity Pattern Co.*, 360 U.S. 55, 64-65 (1959); *Philip Morris, Inc. v. Grinnell Lithographic Co.*, 67 F. Supp. 2d 126, 136 (E.D.N.Y. 1999).  Thus, Plaintiffs are entitled to an injunction and the only issue left for the jury is to determine Plaintiffs' quantum of damages.

Similarly, Plaintiffs' claim under section 17045 of the California Unfair Practices Act (Cal. Bus. & Prof. Code § 17045) also tracks the elements of an RPA Section 2(a) claim.  *Diesel Elec. Sales & Serv., Inc. v. Marco Marine San Diego, Inc.*, 16 Cal. App. 4th 202, 213-14 (1993); *Pet Food Exp. Ltd. v. Royal Canin USA, Inc.*, No. CV 09-01483 MHP, 2011 WL 1464874, at *6 (N.D. Cal. Apr. 18, 2011). The only additional element – the secret nature of Living Essentials' discounts – is also easily met.  Indeed, Living Essentials has long maintained a "story that everyone receive[s] the same pricing," and always did what it could to keep its discounts and promotions secret (SUF ¶ 68), including designating every document produced in this action as "Confidential" and requiring all documents to be filed under seal.  Plaintiffs are therefore entitled to partial summary judgment and an injunction.  *See* Cal. Bus. & Prof. Code §§ 17070, 17080.  *See also id.* § 17082 (no requirement of actual injury for injunction).

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court grant partial summary judgment in their favor and permanently enjoin Living Essentials to provide Plaintiffs with the same pricing as it provides to Costco.

PLTFS' MOT. FOR PART. SUMM. J.
CASE NO. 2:18-CV-1077-CBM-E

Dated:  May 7, 2019                    GAW | POE LLP

                                       By: _____
                                              Mark Poe

                                           Attorneys for Plaintiffs